UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

THOMAS J. HICKEY,

                                   Plaintiff,

– against –

ANNE C. MYERS, DONALD P. ZINGALE, and THE STATE UNIVERSITY OF NEW YORK COLLEGE OF AGRICULTURE AND TECHNOLOGY AT COBLESKILL,

                                   Defendants.

**Complaint**

Civil Action No.

Plaintiff, Thomas J. Hickey, by his attorneys, Cooper Erving & Savage LLP and Thomas J. Marcelle, Esq., for his complaint herein, alleges as follows:

### INTRODUCTION AND JURISDICTIONAL STATEMENT

1. This is a civil rights action for damages brought pursuant to 42 U.S.C. §§ 1981, 1983, and § 2000d to redress violations of plaintiff's rights to be free from retaliation for having spoken out against fraudulent and racially discriminatory practices in education.

2. Defendants, acting under color of state law, have retaliated against plaintiff for asserting that The State University of New York College of Agriculture and Technology at Cobleskill is engaged in fraudulent policies that discriminate against African–American students and in the course of such retaliation unlawfully interfered with plaintiff Hickey's peaceful exercise of his constitutionally protected speech in violation of the First and Fourteenth Amendments to the United States Constitution.

3. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1343 (civil rights jurisdiction).

1

4.  Venue is properly laid in the Northern District of New York, under the provisions of 28 U.S.C. § 1391, in that all, or a substantial part, of the events or omissions giving rise to the claims alleged herein occurred within the Northern District of New York and defendants reside, or are located, in this District.

5.  Plaintiff demands a jury trial of this action.

## PARTIES

6.  Plaintiff Thomas J. Hickey is the former Dean of Liberal Arts and Sciences at the college. He is a tenured professor at the college. Dr. Hickey resides in the County of Otsego, State of New York.

7.  Defendant Anne C. Myers is the Provost and Vice President for Academic Affairs at the college. She resides in the County of Schoharie, State of New York.

8.  Defendant Donald P. Zingale is President of the college. He resides in the County of Schoharie, State of New York.

9.  Defendant The State University of New York College of Agriculture and Technology at Cobleskill is a public educational institution that is part of the State University of New York.

10. Defendants Myers and Zingale were acting under color of the law of the State of New York but are sued under 42 U.S.C. §§ 1981 and 1983 in their personal capacity for committing acts in violation of the Constitution of the United States.

11. Defendants Myers and Zingale are sued in their official capacity under 42 U.S.C. §§ 2000d and 2000d-7.

12. Defendant The State University of New York College of Agriculture and Technology at Cobleskill is sued in its capacity as part of the government of New York State pursuant to 42 U.S.C. § 2000d-7. § 2000d-7 abrogates the sovereign immunity of the States in actions brought

under § 2000d. The college is liable for the actions of defendants Myers and Zingale committed in their official capacity under 42 U.S.C. §§ 2000d and 2000d-7.

13. Defendant The State University of New York College of Agriculture and Technology at Cobleskill is a program or activity receiving Federal financial assistance and/or operates programs receiving Federal financial assistance.

14. Among the areas in which defendant The State University of New York College of Agriculture and Technology at Cobleskill received Federal funds are the following: admissions, recruitment, financial aid, academic programs, student health, counseling and guidance services, discipline, academic assistance, technical education, recreation, physical education, athletics, housing, and employment.

15. The students referred to in this action participated in various programs operated by the college which received Federal financial assistance.

## FACTUAL ALLEGATIONS

16. Since at least 1999, defendant college has had a policy of admitting students whose academic background, as revealed to its admissions office, is such that, given the current programs in effect at the college, they have no reasonable likelihood of graduating. These students are known to lack appropriate academic foundation to succeed at the college level without remediation. The college has taken their tuition for the express and admitted purpose of making budget knowing that these students are not reasonably likely to graduate.

17. This policy targeted African-American students in particular. African-American students were recruited, particularly from the New York City metropolitan area, that the college knew did not meet the admissions standards of the college.

18.  Defendant Myers wrote a memorandum in 1999 describing this policy and, upon information and belief, participated in the development of the policy.

19.  Defendant Myers knew that the policy was harmful to the students affected but did nothing to change it.

20.  Defendant Myers knew that the college was not adhering to its published admissions standards in order to make budget.

21.  Defendant Myers resisted the development of sufficient remedial programs that could have given these students a reasonable chance to succeed at the college level.

22.  This policy has continued unabated to the present time.

23.  In July, 2006, plaintiff Hickey began work in his position as Dean of Liberal Arts and Sciences.

24.  Defendant Myers was not on the Committee that recommended the hiring of Dr. Hickey as Dean.

25.  At the time Dr. Hickey became Dean, he was not otherwise employed by the college and was unaware of the college's improper use of the admissions process to make budget.

26.  Upon his arrival, defendant Myers refused Dr. Hickey's initial request for relevant data relating to the student body at the college.

27.  In October, 2006, only a few months after Dr. Hickey's arrival, defendant Myers announced that there would be a change in the process known as Academic Review. Students are not permitted to pass from the Freshman to the Sophomore year unless they achieve a 2.0 grade point average. Students who, during the course of their Freshman year, had a sufficiently low GPA that they were deemed at risk of not attaining a 2.0 GPA prior to their Sophomore year are subject to Academic Review and, if found incapable of reaching the requisite GPA level, are

dismissed from the college. Mathematically, the lower a student's current GPA, the more unlikely it would be that he or she would ever be able earn sufficient grades to attain a 2.0 GPA. In other words, a student would have to stay in school for years to have any hope of ever raising his or her GPA to 2.0.

28. Defendant Myers lowered the threshold GPA used to determine which students were classified as at risk such that they would be subject to Academic Review. Using a lower threshold GPA meant that students could stay in the school longer even though they had no realistic possibility of obtaining a college diploma. She defended the change by saying the college the revenue from their tuitions to make budget.

29. During the period 2007-2009, Myers continued to lower the standards for Academic Review. At one point, she suspended Academic Review entirely.

30. As a result of his involvement in Academic Review, and a variety of other events that occurred, Dr. Hickey became aware that the college had a longstanding policy of admitting students who were unprepared for college and that this policy was carried out in a particularly egregious manner with respect to African-Americans.

31. For example, in September, 2007, a student complained to Dr. Hickey about a faculty member. The student had a B+ in English Composition; however, when the student put his complaint in writing, it became clear that the student was functionally illiterate. Defendant Myers refused Dr. Hickey's request to remedy the situation. Dr. Hickey then asked the Humanities faculty to require an extemporaneous writing assignment in all classes to assure that functionally illiterate students do not escape detection and could be identified as in need of remediation.

32. In January, 2008, during the process of Academic Review, faculty members informed Dr. Hickey for the first time that students with very low predictors of college achievement (high school grades and/or standardized test scores) had been admitted to the school. Another similar institution, SUNY Delhi, located approximately 30 miles from SUNY Cobleskill, will not accept any of those same students.

33. Statistical data demonstrated that these students had no reasonable chance of succeeding at the college level without substantial remediation; they were not receiving significant remedial education; and they were in fact not succeeding.

34. For the first time, Dr. Hickey learned that these students were being admitted to the college as a conscious policy to enable the college to make its budget and that the policy had been in effect for years.

35. Dr. Hickey learned that the policy was victimizing African-American students in particular, many of whom were being recruited from the New York City metropolitan area to attend the college.

36. Upon learning of this problem, Dr. Hickey discussed the matter with defendant Myers who replied "I do not care about these people." Upon information and belief, defendant Myers had previously expressed the view to faculty that these students were "not cognitively and genetically prepared to function in college."

37. In April, 2008, Defendant Zingale accepted an offer to become President of the college. Dr. Hickey informed him that African-American students were being admitted under false pretenses and then being dismissed from the college.

38. In October, 2008, Dr. Hickey repeated in a written memo to defendant Zingale his objections with respect to the college's policy of admitting African-American students under false pretenses.

39. On December 2, 2008, Defendant Myers sent an email to the faculty stating that "in light of the budget, we will use a 1.0 [Grade Point Average] cut off for first semester freshmen for Academic Review." Thomas Cronin, Professor of Physics, responded by stating, in part: "The list of academically and morally corrupt practices that ensue from our inability to adhere to our own standards is rather long. One of our worst offenses is that we admit, and re-admit students absolutely unqualified and absolutely incapable of achieving a college degree. Many go into debt or cause their families to go into debt into [sic] order to attempt a college degree. This is an absolutely corrupt practice and it may be criminal. If we have done this to even one student, then we are guilty of a very low form of corruption."

40. In March, 2009, a faculty member who investigated the situation determined that African-American and white students were being treated as two separate populations having two overlapping but distinctly separate sets of admissions requirements.

41. Dr. Hickey investigated the policies of the admissions office in this regard and confirmed that in fact the appropriate standards were not being adhered to.

42. Upon information and belief, students' academic records were falsified in order to facilitate the admission of certain African-American students to the college.

43. Dr. Hickey repeatedly requested that the policy be discontinued, or, in the alternative, that the college design remedial programs so that these African-American students could succeed. Other faculty members who were aware of the policy had requested the development of remedial programs for years.

44. Faculty members advised Dr. Hickey that these various practices of academic gerrymandering, combined with racist incidents on campus, created a racially hostile environment at the college which was adversely affecting the college's ability to retain African-American students.

45. The college was using tuition from African-American students to subsidize agricultural programs, which run at an annual deficit, even though these programs serve white students almost exclusively.

46. Dr. Hickey frequently spoke out against the college's policy of fraudulently inducing students, and especially African-American students, to enroll at the college.

47. Nothing in Dr. Hickey's job description as campus ethics officer, or in his duties as Dean, required him to speak out against the college's budgetary policies or against racial discrimination.

48. Defendant Zingale, after becoming aware of the college's policy with respect to the admission of African-American students, actively supported defendant Myers in the perpetuation of such policy.

49. Defendants Myers and Zingale retaliated against Dr. Hickey for speaking out against corrupt budgetary practices and racial discrimination at the college.

50. Defendants Myers and Zingale pursued the removal of Dr. Hickey from his position as Dean and denied him promotional opportunities within the SUNY system.

51. In March, 2009, defendant Myers made false statements about Dr. Hickey that resulted in his not receiving the position of Provost at SUNY Delhi even though he was the only person recommended for the position by the University's duly constituted 16-member search committee.

Upon information and belief, defendant Zingale was aware of and concurred with defendant Myers' efforts.

52. Dr. Hickey and other members of the faculty continued their efforts to redress the treatment of African-American students at the college and to secure appropriate remedial education for those students.

53. In response, on April 7, 2009, defendant Myers ordered a review of Dr. Hickey's functioning in his position as Dean. While other Deans were also reviewed, the review had been suggested by defendant Myers for some time as a vehicle for attacking Dr. Hickey specifically. The review was conducted contrary to the policies of the SUNY Faculty Senate that all administrators be reviewed, and the methodology of review admittedly lacked validity. No change in the methodology was permitted by order of defendant Myers.

54. On July 17, 2009, Dr. Hickey was removed from his position as Dean.

55. Dr. Hickey's complaints of discrimination were a substantial factor in the decision to remove him as Dean and to deny him promotional opportunities within the SUNY system.

## COUNT I

### VIOLATION OF 42 U.S.C. § 2000d: RETALIATION FOR OPPOSING RACIAL DISCRIMINATION IN EDUCATION

56. Repeats and realleges each of the foregoing allegations as if fully set forth herein.

57. Defendants received Federal financial assistance within the meaning of 42 U.S.C. § 2000d.

58. The students subjected to the policies referred to in this complaint were intended beneficiaries of that Federal financial assistance.

59. Plaintiff believed in good faith that defendants intentionally discriminated against those students on the basis of race in connection with a program or activity receiving Federal financial assistance in violation of 42 U.S.C. § 2000d.

60. Individuals who seek to protect the rights of others guaranteed under 42 U.S.C. § 2000d are entitled to do so free from retaliation by those accused of violating said statutes.

61. Dr. Hickey engaged in activity in furtherance of the rights guaranteed under 42 U.S.C. § 2000d. He opposed defendants' fraudulent practices with respect to the admission of African-American students to the college.

62. Defendants Myers, Zingale, and the college, acting by and through defendants Myers and Zingale, intentionally retaliated against Dr. Hickey as aforesaid because of his efforts to protect the rights of the students guaranteed under 42 U.S.C. § 2000d.

63. Defendants Myers, Zingale, and the college, acting by and through defendants Myers and Zingale, are jointly and severally liable to Dr. Hickey for damages, including back pay, front pay, emotional harm, compensatory, and other damages.

64. Dr. Hickey is entitled to reimbursement from all defendants for the reasonable attorneys' fees, costs, disbursements, and expert witness fees incurred in the prosecution of this action.

65. Defendants' actions against Dr. Hickey were undertaken with reckless disregard of plaintiff's constitutional rights and/or with malice towards plaintiff.

66. Due to the wanton, reckless, malicious, and/or intentional nature of defendants' actions, plaintiff demands and is entitled to punitive damages against all defendants, jointly and severally.

## COUNT II

### VIOLATION OF 42 U.S.C. § 1981: RETALIATION
### FOR OPPOSING RACIAL DISCRIMINATION IN CONTRACTS

67. Repeats and realleges each of the foregoing allegations as if fully set forth herein.

68. The college contracted with the students referred to in this complaint to provide them with an education.

69. Plaintiff believed in good faith that defendants Myers and Zingale fraudulently induced the students to enter into such contracts.

70. Plaintiff believed in good faith that defendants Myers and Zingale intentionally prevented the students from enjoying all the benefits, privileges, terms, and conditions of that contractual relationship.

71. Plaintiff believed in good faith that defendants Myers and Zingale intentionally discriminated on the basis of race in the making, performance, modification, and termination of contracts in violation of 42 U.S.C. § 1981.

72. Dr. Hickey engaged in activity in furtherance of the rights guaranteed under 42 U.S.C. § 1981. He opposed defendants' fraudulent practices with respect to the admission of African-American students to the college.

73. Individuals who seek to protect the rights of others guaranteed under 42 U.S.C. §1981 are entitled to do so free from retaliation by those accused of violating said statutes.

74. Defendants Myers and Zingale intentionally retaliated against Dr. Hickey as aforesaid because of his efforts to protect the rights of the students guaranteed under 42 U.S.C. §1981.

75. Defendants Myers and Zingale are jointly and severally liable to Dr. Hickey for damages, including back pay, front pay, emotional harm, compensatory, and other damages.

76. Dr. Hickey is entitled to reimbursement from defendants Myers and Zingale for the reasonable attorneys' fees, costs, disbursements, and expert witness fees incurred in the prosecution of this action.

77. The individual defendants' actions against Dr. Hickey were undertaken with reckless disregard of plaintiff's constitutional rights and/or with malice towards plaintiff.

78. Due to the wanton, reckless, malicious, and/or intentional nature of the individual defendants' actions, plaintiff demands and is entitled to punitive damages against the individual defendants, jointly and severally.

## COUNT III

### VIOLATION OF 42 U.S.C. § 1983: EQUAL PROTECTION

79. Repeats and realleges each of the foregoing allegations as if fully set forth herein.

80. Dr. Hickey concluded that the students referred to in this complaint were treated differently than similarly situated non-minority students in violation of their constitutional right to equal protection of the laws, that defendants acted in bad faith toward those students in violation of their constitutional right to equal protection of the laws, and that defendants violated the students' rights under the applicable federal statutes and regulations.

81. Dr. Hickey spoke out against defendants' practices that violated the constitutional rights of the students. He opposed defendants' fraudulent practices with respect to the admission of African-American students to the college.

82. Plaintiff believed in good faith that defendants Myers and Zingale intentionally discriminated on the basis of race in violation of the students' right to equal protection under the laws.

83. Dr. Hickey engaged in activity in furtherance of students rights' guaranteed under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. He opposed defendants' fraudulent practices with respect to the admission of African-American students to the college.

84. Individuals who seek to protect the rights of others guaranteed under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution are entitled to do so free from retaliation by those accused of acting unconstitutionally.

85. Defendants Myers and Zingale intentionally retaliated against Dr. Hickey as aforesaid because of his efforts to protect the rights of the students guaranteed under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

86. Defendants Myers and Zingale violated plaintiff's constitutional rights while acting under color of the law of the State of New York.

87. Pursuant to 42 U.S.C. § 1983, defendants Myers and Zingale are jointly and severally liable to Dr. Hickey for damages, including back pay, front pay, emotional harm, compensatory, and other damages.

88. Pursuant to 42 U.S.C. § 1983, Dr. Hickey is entitled to reimbursement from defendants Myers and Zingale for the reasonable attorneys' fees, costs, disbursements, and expert witness fees incurred in the prosecution of this action.

89. The individual defendants' actions against Dr. Hickey were undertaken with reckless disregard of plaintiff's constitutional rights and/or with malice towards plaintiff.

90. Due to the wanton, reckless, malicious, and/or intentional nature of the individual defendants' actions, plaintiff demands and is entitled to punitive damages against the individual defendants, jointly and severally, pursuant to 42 U.S.C. § 1983.

## COUNT III

## VIOLATION OF 42 U.S.C. § 1983: FIRST AMENDMENT

91. Repeats and realleges each of the foregoing allegations as if fully set forth herein.

92. Remedying racial discrimination in education and remedying defendants' corrupt budgetary practices was not a part of Dr. Hickey's job so that, when he spoke out, he had the same right to free speech as any citizen of the United States.

93. By objecting to race discrimination and defendants' corrupt budgetary practices, Dr. Hickey engaged in speech which was a matter of public concern and thus protected under the First Amendment to the Constitution of the United States.

94. Dr. Hickey spoke out in a non-disruptive manner.

95. The conduct of defendants Myers and Zingale described above in retaliating against plaintiff violated plaintiff's right to freedom of speech under the First and Fourteenth Amendments to the Constitution of the United States.

96. Defendants Myers and Zingale violated plaintiff's right to freedom of speech while acting under color of the law of the State of New York.

97. Pursuant to 42 U.S.C. § 1983, the plaintiff is entitled to damages against defendants Myers and Zingale as aforesaid.

WHEREFORE, plaintiff respectfully requests that this Court enter judgment in favor of Dr. Hickey against defendants as follows:

A. On Count I, against all defendants for damages, including back pay, front pay, emotional harm, compensatory, and other damages.

B. On Count I, against all defendants for punitive damages.

C.   On Count I, against all defendants for the costs, disbursements, expert witness fees, and reasonable attorneys' fees incurred in the prosecution of this action.

D.   On Counts II, III, and IV, against the individual defendants for damages, including back pay, front pay, emotional harm, compensatory, and other damages.

E.   On Counts II, III, and IV, against the individual defendants for punitive damages.

F.   On Counts II, III, and IV, against the individual defendants for the costs, disbursements, expert witness fees, and reasonable attorneys' fees incurred in the prosecution of this action.

G.   For such other and further relief as this Court may deem just and proper.

DATED:   Albany, New York
         November 23, 2009

COOPER ERVING & SAVAGE LLP
Attorneys for Plaintiff
39 North Pearl Street
Albany, New York 12207
(518) 449-3900

By:   s:/ Phillip G. Steck
      Phillip G. Steck
      Bar Roll #102664

THOMAS J. MARCELLE, ESQ.
Bar Roll # 102117
Of counsel to Plaintiff
2 E-Comm Sq., 3rd Floor
Albany, NY 12207
(518) 427-1720