**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**THOMAS J. HICKEY,**

               **Plaintiff,**

    **- against-**                          **09-CV-01307**

**ANNE C. MYERS, DONALD P. ZINGALE, and**
**THE STATE UNIVERSITY OF NEW YORK**
**COLLEGE OF AGRICULTURE AND**
**TECHNOLOGY AT COBLESKILL,**

               **Defendants,**
_____

**THOMAS J. McAVOY,**
**Senior United States District Judge**


### DECISION & ORDER

## I.    INTRODUCTION

Plaintiff Thomas Hickey, formally the Dean of Liberal Arts and Sciences at the State University of New York College of Agriculture & Technology at Cobleskill ("SUNY Cobleskill" or "the College"), alleges that he was retaliated against by Defendants in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d ("Title VI"), and in violation of 42 U.S.C. § 1981 ("§ 1981"), because he opposed racial discrimination in education.[1]  Defendants in this action are SUNY Cobleskill, its former President, Donald P. Zingale, and its former Provost and Vice President of Academic Affairs, Anne C. Myers.

_____

[1]Plaintiff's First Amendment retaliation claim was dismissed in the Court's March 2, 2010 Decision and Order. See 03/02/10 Dec. & Ord., dkt. # 28.  The Court assumes familiarity with this decision and the subsequent decision on Plaintiff's motion for reconsideration. See 05/31/11 Dec. & Ord., dkt. # 51.

Defendants have moved for summary judgment seeking to dismiss the case in its entirety. See dkt. # 50 (Def. Motion); dkt. # 62 (Def. Reply). Plaintiff has opposed the motion. See dkt. # 60 (Pl. Opp.); dkt # 65 (Pl. Sur-Reply).

## II.   STANDARD OF REVIEW

On a motion for summary judgment the Court must construe the properly disputed facts in the light most favorable to the non-moving party, see Scott v. Harris, 127 S. Ct. 1769, 1776 (2007), and may grant summary judgment only where "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  That is, "[s]ummary judgment is appropriate only if, after drawing all permissible factual inferences in favor of the non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." O'Hara v. National Union Fire Ins. Co. of Pittsburgh, PA, 642 F.3d 110, 116 (2d Cir. 2011)(citing Anemone v. Metro. Transp. Auth., 629 F.3d 97, 113 (2d Cir. 2011)).

## III.   BACKGROUND

The parties have presented a wealth of evidence on the instant motion.  As is the case in many employment discrimination actions, the background facts and the inferences to be drawn therefrom are hotly contested.  The material facts are as follows.

Plaintiff commenced his service as Dean of the College of Liberal Arts and Sciences at SUNY Cobleskill on July 1, 2006.  At the time, there was a transitional leadership at the College.  Defendant Myers served as Vice President of Academic Affairs

2

and as Officer in Charge while a President was being sought.[2]  Plaintiff asserts that he soon discovered that SUNY Cobleskill had a policy, instituted by Myers, of targeting for admission and admitting students whose academic backgrounds were such that they had no reasonable likelihood of graduating unless they were provided remedial education courses.  He also learned that there were not adequate remedial courses available at the College, and that Myers had been involved in "dismantling" the formerly existing extensive remedial education program at the College.  See Kerr Aff. ¶ 14.

As a possible motive for the policy of admitting academically unprepared students, Plaintiff points to a 1999 memorandum from Myers to the College faculty wherein she indicates that high school students who do not meet "our high school [grade point average ("GPA")]" standard are admitted "to make budget."  The memorandum also indicates: "We also were not honest with [these students] up front, explaining what they would have to do in order to succeed here at Cobleskill."  While Defendants contend that the memorandum was written to express Myers's concern for the academically low achieving students and as a call to the faculty to recognize and assist in rectifying the situation, Plaintiff contends it evinces Myers's and the College's purely financial motive in admitting these students.  In support of his belief that Myers had no concern for helping the lower achieving students, Plaintiff points to a portion of the memorandum in which Myers indicates that more attention should be paid to the "better students" who actually have the ability to complete a baccalaureate program.

---

[2]Defendants contend that Plaintiff was hired on Myers's recommendation.  Plaintiff contends that when Myers approved the search committee's recommendation of Plaintiff for the position of Dean, Myers was unaware that the search committee had selected Plaintiff because of his desire to raise academic standards at the College.

In further support of his belief that a financial motive was behind the College's admissions policy, Plaintiff points to a 2005 memorandum from Myers wherein she acknowledges that 30-35% of the entering freshman class was below the College's entry standard of a 75 high school GPA.  While Myers also states in this memorandum that the College needs to "raise entrance admittance and programs need to be up to date and current," Plaintiff points out that Myers continued that the "Admissions Office is holding off on denials this year" and merely instructs the faculty to "support those students being accepted with low high school averages (in order to make budget) as best we can."  Again, Plaintiff contends that the financial motive was evident in the policies that Myers supported.

Plaintiff also learned that Myers had lowered the threshold GPA for identifying "at risk students" in the Academic Review process, and, at one point, eliminated it entirely. This, Plaintiff contends, was done to allow otherwise academically ineligible students to remain in the College so that SUNY Cobleskill could continue collecting tuition from them even though they had no likelihood of graduating.

Plaintiff began opposing the College's policies in communications with Myers in 2007. See Def. L.R. 7.1 Statement of Material Facts ("SOMF") ¶ 198.[3]  Notwithstanding these complaints, the policies continued.  Plaintiff also raised his concerns with the faculty, asserting that something had to be done about the vast number of under-prepared students in the College and announced his intention to change the policies.  Plaintiff and

---

[3]Where Defendants' SOMF is cited, it is in situations where Plaintiff has either admitted the proposition in Defendants' Statement, or has failed to provide sufficient support for his opposition to the statement. See N.D.N.Y. L.R. 7.1(a)(3).

some faculty members also believed that the College's admission and retention policies disproportionately involved African-American students.  Although Plaintiff had no statistical or other evidence supporting this position, he believed that African-American students with weak academic backgrounds had been targeted for admission and induced to enroll on the false pretense that they could earn a degree even though the College had no intention of ensuring such an outcome by providing the necessary remedial education classes. Further, Plaintiff believed that African-American students were disproportionately affected by the policy that lowered the College's review standard, and that the College did so only to allow it to collect tuition monies from these students for a longer period of time.

As early as 2007, Plaintiff began to raise his belief to Myers that there were racial implications in the College's admission and review policies. Def. SOMF ¶ 198.   According to Plaintiff, this resulted in a philosophical disagreement between Hickey and Myers with Myers purportedly taking the position that the remedial programs available to all students ameliorated any racial impact of the College's policies.[4]   Plaintiff also asserts that Myers, as Officer in Charge of the College, was indifferent to racist and bigoted actions by members of the student body occurring on campus.

During a meeting between Myers and the Department Chairs, Myers revealed her intention to use an upcoming evaluation of the College's Deans to obtain negative faculty reviews of Plaintiff so she could remove him as Dean and replace him with Dr. Susan Zimmerman, the professor who eventually replaced Plaintiff as Dean of the College of

---

[4]Myers purportedly believed that the few remaining remedial classes, two additional programs, EOP and MERITS (both of which provided educational assistance to certain students), and the available individual tutoring programs on campus were sufficient to meet the needs of the students.

Liberal Arts and Sciences.  See Hickey Aff., ¶¶ 63- 66; Fred Kowal Aff. ¶ 8; John Kowal

Aff. ¶¶ 5-12.  Myers stated that the reason she wanted to remove Plaintiff as Dean was

because she did not believe that raising objections to the College's policies of admission

and retention was part of a Dean's job and that, therefore, Plaintiff was not doing his job

properly.  See Fred Kowal Aff. ¶ 8.

    Myers contends that she sought to replace Hickey as Dean because she received

more written complaints about Plaintiff's performance as Dean than she did about any

other Dean while she served as Officer in Charge.  See Myer's Decl. ¶ 14.  These

complaints described Plaintiff as offensive, vengeful, intimidating, unprofessional, lacking

in follow through or advocacy for his departments, and having a habit of shifting his work

to the Department Chairs.  Id.  Plaintiff counters that there were actually very few

complaints about him, that these few were without basis, that one was repudiated, and

that Myers made no effort to investigate any of the complaints.

    At the end of the 2007-2008 school year, Defendant Zingale was selected as

President of SUNY Cobleskill.  In May 2008, after Zingale assumed his duties as

President but before he arrived on campus and began overseeing the College, Plaintiff

called him hoping to enlist his support for Plaintiff's proposed changes at the College.

Plaintiff advised Zingale of "the problem of under-prepared students," Hickey Aff. ¶ 36,

and alerted Zingale to his concerns about the retention of unqualified students and its

correlation with race.  Def. SOMF ¶ 198.  Plaintiff requested that the policies be

discontinued, and that the College design remedial programs so at-risk African-American

students could improve their potential to succeed academically.  To Plaintiff, Zingale

sounded unconcerned.  Hickey Aff. ¶ 36.  Plaintiff also spoke to Zingale about his future at

SUNY Cobleskill and expressed his concern that Myers was contemplating his removal as Dean.

Myers also contacted Zingale before he began as President and related her belief that Hickey was not properly performing his duties as Dean.  Myers shared her concerns about what she saw as Hickey's deficiencies, and indicated that Hickey's functioning as Dean was so lacking that she contemplated removing him from this position before Zingale arrived.  Zingale advised Myers that he would prefer to observe Hickey's performance as Dean, and encouraged Myers to retain Hickey in the Dean's position so that Zingale could decide whether Hickey could continue to serve as Dean in Zingale's administration.  The Deans' Evaluation did not take place as scheduled, apparently at the request of the faculty and in anticipation of Zingale arriving on campus at the start of the Fall 2008 semester.[5]

At the start of the Fall 2008 semester, Myers issued a document called the "Master Schedule Guidelines" that, according to Plaintiff, "changed the way scheduling was done at SUNY Cobleskill."  This change shifted control of scheduling decision from a collaborative determination between Department Chairs and the Deans to a unilateral determination by Myers.  Plaintiff met with Department Chairs, some of who complained about the new procedure.  Plaintiff conveyed these complaints to Myers.  Myers was apparently already aware that some faculty members and Chairs objected to the change, but she did nothing to alter it.

On September 25, 2008, Social and Behavioral Sciences Department Chair Fred

---

[5]Myers asserts that Zingale requested that the Deans' Evaluation not be conducted before he arrived on campus.

Kowal, who was under Hickey's supervision in the School of Liberal Arts and Sciences, sent an e-mail to Zingale making a number of complaints about faculty loads, course maxima, and reporting, among other things, indicating that some members of the faculty were confused and resentful by the scheduling procedure Myers instituted.  Myers responded to the e-mail by indicating that the Deans had not done what she asked them to do with regard to the new procedure, and that she suspected that Hickey "handed this to the Chairs instead of taking control."   Zingale responded to Kowal's e-mail the next day, noting, among other things, that for his School it was Dean Hickey who was charged with the responsibility for workload determinations, to determine course maxima, to ensure balanced programming, and to ensure clarity of faculty expectations.  Zingale advised Kowal to address his issues directly with Hickey, and copied Hickey directing "Dean Hickey to also respond to [Kowal's] original e-mail with a copy of his response, at least, to [Provost Myers] and to [Dr. Zingale]."

Hickey assumed that Zingale was not aware that Myers had retained the decision making power to herself on the issues of scheduling, and further, he did not believe the issue was urgent because it concerned the schedule for Spring 2009 so he did not respond immediately.   On October 4, 2008,  Zingale e-mailed Hickey again to remind him that it had been more than a week since Zingale had responded to Dr. Kowal's e-mail and that Zingale had yet to receive a response from Hickey.  Zingale directed that Hickey "please handle this immediately and take great care to provide very specific and comprehensive replies to each issue."  Hickey responded on October 6, 2008, after Zingale had sent another e-mail prompt to Hickey.

On October 5, 2008, Hickey delivered an "Ethics Memorandum" to Zingale that

8

raised, *inter alia*, the ethical propriety of admitting students "who have little chance to succeed" without also providing a "meaningful remedial program to address their academic deficiencies."[6] The memorandum expressed Plaintiff's belief that there may be "a strong correlation between academic dismissal or suspension and a student's race, although [Plaintiff had] not been provided with the data that would permit this analysis."   In response, Zingale directed Plaintiff to provide written proposals within 30 business days that would address the concerns he raised in the memorandum.  Zingale instructed Plaintiff to work with Myers, who was the Vice President of Academic Affairs, and with the Dean of Enrollment Management, regarding improvements in outreach, remediation, and retention strategies in order to recruit and retain students who were better prepared for college work while also supporting those who were most challenged.  Zingale also advised Plaintiff that there was no reason to mark his response "confidential" as he had done on the October 5, 2008 Memorandum.

Plaintiff believed that at the time, Myers, who had a coalition of faculty members who supported her positions on campus,[7] was pressuring Zingale to remove Plaintiff as Dean.   Myers, who was copied on the e-mail from Zingale to Hickey, sent Zingale an e-

---

[6]Hickey sent the Ethics Memorandum in his capacity as SUNY Campus Ethics Officer with a subject captioned as "Possible Ethics Violations at SUNY Cobleskill." In the memorandum, Hickey expressed concern about, and offered to assist the President with, four items:

    1) faculty attending professional conferences funded by publishers;
    2) spouses supervising spouses;
    3) the likelihood of suspension and dismissal for students with certain high school GPAs and SAT scores, and Plaintiff's recognition that the College had a duty to provide its students with a meaningful remedial program to address their academic deficiencies; and
    4) obsolete and/or inadequate programs in the School of Business.

[7]Plaintiff asserts that Myers's supporters had hats imprinted with the acronym FOAM  - for "Friends of Ann Myers"  - and included Professor Zimmerman and others who would eventually provide negative reviews of Plaintiff in the evaluation that Myers prepared.

mail stating: "My guess is that he know [*sic*] something is coming down and wants to cover himself under whistle blower acts."  Hickey Aff., ex. 29.

Hickey contends that Zingale assigned him an impossible task in addressing the identified problems in the short time period accorded.  Hickey responded on November 19, 2008 and provided some details on the avenues he was pursuing. Plaintiff indicated, among other things, that he had requested that a grant request submitted by another faculty member incorporate provisions for remedial education for under-prepared students as Zingale had suggested, and he provided a few charts from another professor that demonstrated a correlation between admissions standards and student retention.  Hickey admits that, at the time, he needed more data to conduct a "serious review of the issue of under-prepared students." Hickey Aff. ¶ 48.  Nothing in the November 19, 2008 response or attached charts explicitly indicates a racially disparate impact from the College's admission and retention policies.

Zingale felt that Hickey had not properly responded as requested.  Zingale also felt that Plaintiff was not fulfilling his duties as Dean because Plaintiff was balking at attending the dinners and social functions that Zingale arranged.  Zingale asserts that, as President, he relied upon his deans to address the College's day-to-day responsibilities, including recruitment, assessment, retention, remediation and fulfillment of the College's mission, and held the deans accountable in meeting the College's mission.  Zingale expected the Deans' participation in long scheduled Deans' Dinners and other events which he saw as opportunities for Zingale to learn what he needed to know from the Deans and other managers, to team build, and to learn from the Deans what they viewed as the needs of students and faculty and the successes and failings of the College.  Zingale contends that

10

Hickey missed several of these functions.  Hickey asserts that the functions served no

purpose other than as social gatherings where the participants drank too much alcohol,

and that, by the time Zingale decided to remove him as Dean, he had missed only one

such function because he was ill and arrived late at another because his airline flight had

been delayed.

By March 2009, Zingale was convinced that Hickey would have to step down as

Dean.  Def. SOMF ¶ 116.  At approximately this time, the State University of New York at

Delhi ("SUNY Delhi") was conducting a nationwide search for a Provost.  A search

committee was empaneled and charged with providing the names of three (3) applicants

to SUNY Delhi's President, Candace Vancko.  See Vancko Aff. ¶ 3.  Plaintiff applied for

the position and was selected as one of the three names provided to Vancko. Id. The

applicants were not graded or ranked by the search committee. Id. Vancko had heard

Hickey make comments at an open forum at SUNY Delhi during the search process which

she felt were "fatal" to Plaintiff's application. Id. ¶ 5.   Vancko felt that one candidate, not

Hickey, was the superior of three.  Id. ¶ 7.  Although Plaintiff has provided evidence

indicating that Myers gave a positive reference for one of the other candidates and was

"honest" and gave an "unfavorable" assessment of Plaintiff to Vancko, see Plt. ex, 80 &

81,  Vancko did not recall any negative references from Myers or Zingale regarding Hickey

and recalled Zingale "speaking well" of Hickey.[8]  Vancko Aff.  ¶ 8.  Vancko concluded that

"Dr. Hickey's performance in the interview process demonstrated that he was not the right

choice as Provost for SUNY Delhi under my administration.  His references did not affect

---

[8]Zingale contends that he had hoped that Hickey would be successful in obtaining the SUNY Delhi
Provost position, and provided a positive recommendation to assist in this regard.

my choice." Id. ¶ 9.

Also in March 2009, Myers sent Zingale a memorandum regarding the Deans' Evaluations, indicating: "I have Jennifer Gray working on evaluations for the deans and me to go out to faculty and staff in a week or so.  I was going to run these last year if you remember.  This will provide the additional significant data we need before taking action." Zingale Dep., p. 130.   Zingale testified that he had already "pretty much made up [his] mind that this was not the right match for [Plaintiff] before March and if [Myers] wanted to run an evaluation, that's all well and good."  Id. p. 103-131.  Zingale also testified: "So whether there was an evaluation or not and what Anne Myers hoped to achieve with that evaluation really wasn't a major consideration for me." Id. p. 131.

The evaluation went forward in April 2009.  More than one-half of those responding to the evaluation of Hickey reported that, in their opinion, Hickey's overall job performance was "Ineffective (does not meet performance standards)."  The comments provided in some of the reviews were exceedingly negative of Plaintiff's performance as Dean.  Myers believed the comments in the evaluation reaffirmed complaints about Hickey's poor communications skills, his lack of performance, his divisive nature, his shuffling off of work, his lack of participation in important events, and general lack of professionalism throughout his tenure as Dean.  Myers Decl. ¶ 59.

Plaintiff admits that the evaluation, that pertained to him and two other Deans, contained nothing that targeted him specifically.  However, he contends that the evaluation was used merely as a tool to gain negative responses about him in a manner akin to a popularity contest, and that Myers used this evaluation format knowing that she had a loyal coalition of faculty members who supported her position on campus and who would

12

provide negative evaluations of Plaintiff. <u>See</u> fn. 7, *supra.*  Further, Plaintiff contends that

the evaluation process, which resulted in a very small percentage of responses, was not

conducted according to established methodology, was such a small sample that it had

little if any empirical value, and that he received many positive responses in it.

Following the Deans' Evaluation, Zingale determined that Hickey would stay in his

position as Dean of Liberal Arts and Sciences only until August 23, 2009, at which time he

would transition to a position as full Professor with a continuing appointment in the Social

Sciences Department.  However, the parties agree that "Dr. Zingale's determination that

Dr. Hickey simply did not meet his expectations as Dean did not depend upon the . . .

evaluation of the Deans in April 2009."  Def. SOMF ¶ 118.  This action followed.

## IV.   DISCUSSION

Plaintiff believed that the College's policies of admitting and retaining academically

unqualified students without providing necessary remedial education classes had a

disparate impact on African-American students, thereby denying these students equal

access to the full extent of SUNY Cobleskill's academic programs, in violation of Title VI.

Plaintiff further believed that Defendants Myers and Zingale induced African-American

students to enter into tuition contracts under the false pretense that they could hope to

obtain a degree while preventing the students from enjoying all the benefits, privileges,

terms and conditions of the contractual relationship by failing to provide the necessary

remedial education classes, thereby intentionally discriminating on the basis of race in the

making, performance, modification, and termination of contracts, in violation of 42 U.S.C.

§ 1981.  See  03/02/10 Dec. & Ord., pp. 9-10 (dkt. # 28).[9]  Plaintiff asserts that Defendants

retaliated against him for his complaints of these practices by removing him as Dean and

by providing false or negative references about him resulting in his denial of the Provost

position at SUNY Delhi.  Defendants assert that no discrimination occurred in its policies,

and that it did not retaliate against Plaintiff for his complaints.

### a.  Title VI

Title VI provides that "[n]o person in the United States shall, on the ground of race,

color, or national origin, be excluded from participation in, be denied the benefits of, or be

---

[9] As the Court explained on the motion to dismiss:

To prevail on the merits [of the § 1981claim], Plaintiff must allege that he participated in a protected activity.  To do this, Plaintiff must demonstrate that he had a "good faith, reasonable belief that the underlying challenged actions of the employer violated the law." Turner v. National R.R. Passenger Corp., 181 F. Supp.2d 122, 134 (N.D.N.Y. 2002). Plaintiff, however, does not have to prove that the conditions against which he protested actually amounted to a violation of § 1981.  See Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002) ("A plaintiff may prevail on a claim for retaliation even when the underlying conduct complained of was not in fact unlawful, so long as he can establish that he possessed some good faith, reasonable belief that the underlying challenged actions of the employer violated the law) (internal citations omitted)); Turner, 181 F. Supp.2d at 134; Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons, 842 F.2d 590, 593 (2d Cir. 1988).

Plaintiff alleges that under-qualified African-Americans were targeted and fraudulently coerced into entering into contracts with the College with the understanding they could attain a college degree.  The College was fully aware that this was extremely unlikely given the lack of remedial courses available.  Plaintiff alleges that he was removed as Dean of the College because he vocally opposed this admission policy.  Specifically, Plaintiff contends that Defendants fraudulently induced students into contracting with the school for the chance to receive a college degree in order to use their tuition money to make budget.  Plaintiff maintains that Defendants intentionally targeted and recruited African-Americans for the fraudulent scheme and that the scheme disproportionately affected African-American students.  Plaintiff argues that by contracting with these African-American students to earn a college degree but not providing them with remedial education, SUNY Cobleskill intentionally prevented the students from attaining a college degree thus interfering with the benefit of their contracts.  Plaintiff alleges that he "exposed this disparity to the Provost, who, in light of her own biased opinion on the issue, chose to allow the policy to continue taking its toll on the affected students" and in retaliation for his complaints removed him from his position as Dean.

03/02/10 Dec. & Ord., pp. 9-10 (dkt. # 28).

14

subjected to discrimination under any program or activity receiving Federal financial

assistance." 42 U.S.C. § 2000d.   It is well established that "private individuals may sue to

enforce . . . Title VI and obtain both injunctive relief and damages." Alexander v.

Sandoval, 532 U.S. 275, 279 (2001); see Peters v. Jenney, 327 F.3d 307, 315 (4th Cir.

2003).  A plaintiff may bring a claim under Title VI for retaliation for opposing practices that

one reasonably believes constitute intentional discrimination under Title VI.  See Peters,

327 F.3d at 318-19; see also 34 C.F.R. § 100.7(e)(prohibiting intimidatory, coercive, or

discriminatory conduct engaged in " for the purpose of interfering with any right or privilege

secured by Section 601" of Title VI).  However, "Title VI does not provide for individual

liability, only liability against entities that receive federal financial assistance." Bossie v.

Houle, 2011 WL 4435699, at *3 (D. Conn. Sept. 23, 2011)(citing cases).  Thus, to the

extent Plaintiff asserts individual capacity claims against Defendants Myers and Zingale

under Title VI, see Am. Comp. ¶ 67 (seeking to impose joint and several liability on all

Defendants for the purported Title VI violation), the claims are dismissed.  To the extent

Plaintiff asserts official capacity claims against Defendants Myers and Zingale, see Am.

Comp. ¶ ¶ 11-12, the claims are one and same as the claim against Defendant SUNY

Cobleskill. See Mathie v. Fries, 121 F.3d 808, 818 (2d Cir. 1997)("A claim against a

government officer in [his or her] official capacity is, and should be treated as, a claim

against the entity that employs the officer. . . .")(citing Kentucky v. Graham, 473 U.S. 159,

165-66 (1985)); Booker v. Board of Educ., Baldwinsville Central, 238 F. Supp.2d 469, 475

(N.D.N.Y. 2002)(Munson, S.J.) ("The real party in interest in an official capacity suit is the

governmental entity and not the named official.").  Inasmuch as SUNY Cobleskill is named

as a defendant on this claim, the official capacity claims against Defendants Myers and

Zingale brought under Title VI are dismissed as redundant.  See Booker, 238 F. Supp.2d at 475  ("[D]istrict courts have dismissed official capacity claims against individuals as redundant or unnecessary where Monell claims are asserted against an entity.").

### b.  Section 1981

Section 1981 provides, in pertinent part, that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts   . . . as is enjoyed by white citizens."  In CBOCS West Inc. v. Humphries, 128 S. Ct. 1951 (2008), the Supreme Court held that this provision "encompasses a complaint of retaliation against a person who has complained about a violation of another person's contract related right." Id. at 1954.  Plaintiff brings the Section 1981 claims only against Defendants Myers and Zingale in their individual capacities.  See Am. Compl. ¶ 10.

### c.  McDonnell Douglas

On a summary judgment motion, "[a]llegations of employment discrimination under Title VI and Section 1981 are analyzed under the same three-part burden-shifting framework of [McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–804 (1973)] as Title VII claims." Pacheco v. New York Presbyterian Hosp., 593 F. Supp.2d 599, 629 (S.D.N.Y. 2009)(citing Patterson v. McLean Credit Union, 491 U.S. 164, 186 (1989) (deciding that burden-shifting scheme developed under Title VII "should apply to claims of racial discrimination under § 1981"), superseded by statute on other grounds, Civil Rights Act of 1991, Pub.L. No. 102-166, 105 Stat. 1074; Bush v. Fordham Univ., 452 F. Supp.2d 394, 405 (S.D.N.Y.2006) (same); Solomon v. Uniondale Union Free Sch. Dist., 2007 WL

608137, at *3 (E.D.N.Y. Feb. 16, 2007) (noting that Title VII burden-shifting framework applies to Title VI cases); McKie v. New York Univ., 2000 WL 1521200, at *3 n. 1 (S.D.N.Y. Oct. 13, 2000) (same)); Turner v. National R.R. Passenger Corp., 181 F. Supp.2d 122, 134 (N.D.N.Y. 2002)(applying burden-shifting framework to § 1981 claims.) Under the McDonnell Douglas analysis, Plaintiff must first establish a *prima facie* case of retaliation. Collins v. New York City Transit Authority, 305 F.3d 113, 118 (2d Cir. 2002). Plaintiff's burden of establishing a *prima facie* case is *de minimis.* Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir. 2008).

If Plaintiff establishes a *prima facie* case, the burden of production shifts to Defendants to articulate a legitimate, nondiscriminatory reason for the challenged actions. Holcomb v. Iona Coll., 521 F.3d 130, 138 (2d Cir. 2008). Defendants' burden of production at this stage "is not a demanding one," Bickerstaff v. Vassar College, 196 F.3d 435, 446 (2d Cir. 1999), they need only offer a basis for the employment decision in issue which, "taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993).

If Defendants proffer a legitimate, nondiscriminatory reason for the challenged actions, "the presumption raised by the *prima facie* case is rebutted, and drops from the case." St. Mary's Honor Ctr., 509 U.S. at 507. The burden shifts back to Plaintiff who "then has the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision, and that [unlawful retaliation] was." Fisher v. Vassar College, 114 F.3d 1332, 1336 (2d Cir. 1997)(*en banc*)(internal citation and quotation marks omitted), cert. denied, 522 U.S. 1075 (1998). The ultimate burden of persuasion remains

always with Plaintiff.  St. Mary's Honor Ctr., 509 U.S. at 507, 511.  In determining whether

Plaintiff can satisfy this ultimate burden, the Court must examine the entire record and

apply "a case-by-case approach." Schnabel v. Abramson, 232 F.3d 83, 90 (2d Cir. 2000).

### d. *Prima Facie* Case

To state a *prima facie* claim for retaliation under Title VI or § 1981, a plaintiff must

plausibly allege (1) participation in a protected activity known to the defendant; (2) adverse

action by the defendant against the plaintiff; and (3) a causal connection between the

plaintiff's protected activity and defendants' adverse action. Williams v. City University of

New York, Brooklyn College, 2011 WL 6934755, at * 6 (E.D.N.Y. Dec. 30, 2011)(Title VI)

Turner, 181 F. Supp.2d at 134 (§ 1981).  There is no dispute that Defendants were aware

that Plaintiff had complained of what he believed to be racially discriminatory recruiting

and retention policies at the College, which included, by implication, complaints about the

racially discriminatory tuition contract practices.  This included complaints that Plaintiff

made as early as 2007 to Myers in her role as Officer in Charge, to Zingale in May 2008

after he was selected as President but before he began in that role, and in the Ethics

Memorandum dated October 5, 2008 to Defendant Zingale. This satisfies the first element

of the *prima facie* case.  There is also no dispute that Plaintiff was removed as Dean of

the College of Liberal Arts and Sciences at SUNY Cobleskill, satisfying the second

element of the *prima facie* case.

On third element of the *prima facie* case, causation can be shown: "(1) indirectly, by

showing that the protected activity was followed closely by discriminatory treatment, or

through other circumstantial evidence such as disparate treatment of fellow employees

who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." Gordon v. New York City Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000). Here, there is little evidence of causation between Plaintiff's complaints of racial discrimination in the College's policies and his removal as Dean. The removal decision was made by Zingale. Plaintiff has presented no direct evidence of a retaliatory statement or other action by Zingale that ties the removal decision to Plaintiff's complaints of race discrimination in the College's policies.[10]

The circumstantial evidence that Zingale harbored a discriminatory animus is also lacking. Plaintiff raised the racial issues with Zingale in May 2008 before Zingale began as President. At the same time, Myers, who was then Officer in Charge, indicated to Zingale her desire to remove Plaintiff as Dean. However, Zingale encouraged Myers to retain Plaintiff as Dean, which she did. Moreover, when Hickey provided Zingale with the October 5, 2008 Ethics Memorandum again raising the possibility of racial implications in the College's admission and retention policies, Zingale directed Hickey to work with other administrators to develop changes to the College's policies and admonished Hickey not to mark his proposals as confidential. It was not until March 2009, ten months after Hickey first raised with Zingale the issue of the racial implications in the College's policies, that Zingale decided that Hickey should step down as Dean, and it was not until April 2009, eleven months after Hickey raised the issue, that Zingale decided that Hickey would be

_____

[10]Plaintiff asserts that Defendants' statement at ¶ 114 of their SOMF constitutes an admission that he was removed as Dean because he opposed racial discrimination in the College's policies. However, Defendants SOMF ¶ 114 provides: "Dr. Hickey's failure to provide Dr. Zingale evidence of his efforts to remedy the concerns he raised and to provide his written proposals to address the same, along with his other performance issues discussed [in] Dr. Zingale's declaration ... resulted in Dr. Hickey's dismissal." Neither this statement nor Zingale's declaration establishes or admits that Defendants took action against Plaintiff for opposing racial discrimination in the College's policies.

removed as Dean.

While "[t]he causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action," Cifra v. General Elec. Co., 252 F.3d 205, 217 (2d Cir. 2001)(quotation marks omitted); see Bennett v. Goord, 343 F.3d 133, 139 (2d Cir. 2003)("[W]here . . . circumstantial evidence of a retaliatory motive is sufficiently compelling, direct evidence is not invariably required."), case law "uniformly hold[s]" that the temporal link "must be very close." Clark Co. Sch. Dist. v. Breeden, 532 U.S. 268, 273-74 (2001).  Neither the Second Circuit nor the district courts within this Circuit have "drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish [such] a casual relationship. . . ." Gorman-Bakos v. Cornell Coop. Extension of Schenectady County, 252 F.3d 545, 554, 555 n.5 (2d Cir. 2001).  "Courts have generally concluded that 'a passage of two months between the protected activity and the adverse employment action seems to be the dividing line,'" Levitant v. City of New York Human Resources Admin., 625 F. Supp.2d 85, 108 (E.D.N.Y. Dec.18, 2008)(quoting Cunningham v. Consol. Edison, Inc., No. 03 Civ. 3522, 2006 U.S. Dist. LEXIS 22482, at *55-56, 2006 WL 842914 (E.D.N.Y. Mar. 28, 2006) (collecting cases)), although recent decisions have found that gaps in time up to four months may support a finding of causality. See Hubbard v. Total Commc'ns, Inc., 347 Fed. Appx. 679, 681 (2d Cir. 2009); Levitant, 625 F. Supp.2d at 108–100.  Here, and in light of the circumstances addressed above, the time between Plaintiff's protected activity and the adverse employment decision by Zingale is too attenuated to establish causation.

Nevertheless, Plaintiff presents some evidence of direct discrimination from Myers

and which could be construed as impacting the removal decision.  A reasonable fact finder could conclude that when Myers expressed in a meeting with Department Chairs an intention to remove Plaintiff as Dean because he opposed the College's admission and retention policies, she was referring to his complaints of racial inequality in these policies that Plaintiff had been raising since 2007.  Further, and despite that Zingale made the decision to remove Plaintiff as Dean, a reasonable fact finder could conclude that Myers played some role in that decision.  See Bickerstaff, 196 F.3d at 450 (Title VII claim may be established  "even absent evidence of illegitimate bias on the part of the ultimate decision maker, so long as the individual shown to have the impermissible bias played a meaningful role in the . . . process." ).  Indeed, Myers had expressed an intention to remove Plaintiff as Dean when she spoke to Zingale before he began as President, she sent an e-mail to Zingale after the October 5, 2008 Ethics Memorandum indicating that Plaintiff must sense that "something is up," and she sent a memorandum to Zingale in March 2009 indicating that her evaluations "will provide the additional significant data **we need** before taking action."  (emphasis added).  This all raises the inference that Myers was involved to some degree in the decision making process to remove Plaintiff as Dean.  Although the connection is somewhat tenuous,[11] this is sufficient to establish Plaintiff's minimal burden at the *prima facie* stage thereby shifting the burden to Defendants to articulate a legitimate, non-discriminatory reason for the adverse employment action.

---

[11]Assuming that it could be inferred that Myers harbored animus against Plaintiff because of his complaints of racial inequality in the College's policies that he had been raising since 2007, it appears somewhat incongruous that Myers did not remove Plaintiff as Dean although she seemingly had the power to do so before Zingale began as President.

### e.   Defendants' Legitimate, Non-Discriminatory Reason

Defendants assert that the College's policies were not racially discriminatory and that the percentage of graduating African-American students was equivalent to white students with similar high school GPAs or standardized test scores prior to admission. Nevertheless, Defendants assert that they accepted the criticism that Plaintiff leveled and assigned him the duty of designing and implementing a remedial education program that would ameliorate any of the problems that Plaintiff perceived.  Defendants contend that "Dr. Hickey's failure to provide Dr. Zingale evidence of his efforts to remedy the concerns he raised and to provide his written proposals to address the same, along with his other performance issues . . . resulted in Dr. Hickey's dismissal."  Def. SOMF ¶ 114. Defendants further contend that Plaintiff was removed as Dean because he was ineffectual in this position and failed to fulfil his responsibilities.  In this regard, Defendants assert that Plaintiff failed to attend College social functions he was expected to attend such as Deans' Dinners, was poorly regarded by the faculty he supervised as revealed in the evaluations, and failed to accomplish the requirements of his position including designing and implementing the remedial education program he had requested.  While Plaintiff may contest the facts underlying the employer's stated reasons for its employment decision, the articulation of these legitimate, non-discriminatory reasons for the adverse employment action is sufficient to satisfy Defendants' burden.  Thus, the presumption raised by the *prima facie* case is rebutted and drops from the case, and the burden shifts back to Plaintiff to demonstrate that the proffered reason was not the true reason for the employment decision or that the decision was motivated by a unlawful retaliatory intent.

**f.  Plaintiff's Ultimate Burden- Dean's Position**

Plaintiff seemingly has three difficult hurdles to surmount in order to prevail on his claims related to the Dean's position.  First, he must establish that he held a good faith belief that the College's policies violated Title VI by denying African-American students equal access to the College's programs, and/or that the policies violated § 1981 by interfering with African-American students' rights to make and enforce contracts equal to white students.  Second, he must establish that Defendants held an animus against him because he opposed the racial impact of the College's policies, not simply because he opposed the policies that allowed all low achieving students to be admitted and retained at the College, or for some other reason unrelated to his complaints of the racial impact of the College's policies.  And third, he must establish that this race-based animus was a motivation for Zingale's decision to remove him as Dean.

The parties have not addressed the first issue in much detail although it would appear to the Court that a race neutral policy that allows the admittance and retention of all low achieving students could not, in good faith, be construed as a policy that violates Title VI or § 1981.  Plaintiff asserts, however, that SUNY Cobleskill targeted low achieving African-American students for admission, thus resulting in his good faith belief that the College's policies of retaining low achieving students without the necessary remedial education classes, and entering tuition contracts with these students although there was little likelihood that they would succeed, had a disparate impact on African-American students and thus were in violation of Title VI and § 1981.  Plaintiff has provided some evidence indicating that SUNY Cobleskill did "admit black students with lower high school averages than white students," Pl. Aff. ¶ 53, Ex. 39.  Given this, the Court will assume for

23

purposes of this motion that Plaintiff can demonstrate that he held a good faith,

reasonable belief that the underlying challenged actions of the College violated Title VI

and § 1981.  This satisfies this issue for purposes of the instant motion.

On the second and third issues, Plaintiff contends that Defendant Myers held a

discriminatory motive which she imputed upon Defendant Zingale in the removal decision,

thus making Defendants' articulated reason for his removal a mere pretext for retaliatory

discrimination.  However, Plaintiff's theory of discrimination is based, in large part, upon

his mere supposition that Myers held an animus against him because he challenged the

racial implications in the policies that she marshaled, and that she exerted enough

influence over Zingale that he adopted this discriminatory animus. The following series of

questions from Plaintiff's deposition seems to indicate that his proof of discrimination

amounts merely to a suspicion that an illegal retaliatory motive prompted his removal as

Dean.

> Q:  Did anyone retaliate against you because of your being honest with students
>      at open houses about what they needed to do to succeed?
>
> A:  Did they retaliate against me for that? I don't know. Have I
>     experienced retaliation since I've been there?  Yes. Can I
>     dichotomize as to what the specifics were that resulted in the
>     retaliation? Probably not.
>
> Q:  Can you identify that the reason they retaliated against you was because of
>      your position on racial discrimination on campus?
>
> A:  No. I think it was, but I'm not -- can I -- can I prove that? I can prove it
>     perhaps by statements that were  made -- that were made to other
>     individuals and by the fact that an evaluation was conducted. It was -- that
>     was almost completely unreliable.
>
> Q:   What did that have to do with the race, the evaluation ones [*sic*] employed?
>
> A:   I think that -- I think that my identifying race is a problem at SUNY Cobleskill

was one of the things that led to that evaluation.

Q:    Okay. But I'm asking: Why do you draw that conclusion?

A:    Why do I draw that conclusion? Because the time that I was raising this issue and the evaluation that was developed and proposed were very close. There was a nexus there.

Hickey Dep. pp. 114-15.

The statements to which Plaintiff refers in this deposition passage were the statements Myers purportedly made during the meeting with the Department Chairs when she indicated that she intended to conduct the Deans' Evaluation to gather negative information so she could remove Plaintiff as Dean.  As indicated above, Myers purportedly stated that she wanted to remove Plaintiff as Dean because he was contesting the College's admission and retention policies.  The affidavits of the two professors who were at the meeting and who reported to Plaintiff what Myers purportedly said, Fred and John Kowal, do not indicate that Myers stated that she wanted to remove Plaintiff as Dean because he raised concerns with the racial implications of the admissions and retention policies, but only that it was not "his job" to challenge the policies in general.  See Fred Kowal Aff. ¶ 8 (Myers and Prof. Zimmerman "did not think Tom's objections to the college's policies on admission and retention of students was part of his job."); John Kowal Aff. ¶ 10 ("Anne Myers said that it was not Tom Hickey's job to get involved in admissions matters.").

Nevertheless, a reasonable fact finder could conclude that Myers was referring to Plaintiff's challenges to the racial implications of the admissions and retention policies. Further, given the circumstantial evidence addressed above that raises an inference that Myers played some role in the decision making process to remove Plaintiff as Dean, the

25

reasonable inference can be drawn that Myers played a meaningful role in the decision to remove Plaintiff as Dean.  See Holcomb v. Iona College, 521 F.3d 130, 132  (2d Cir. 2008)("Of the five officers of the college formally involved in the decision to end Holcomb's employment, Holcomb imputes improper racial motives to two people: Shawn Brennan (the Director of Athletics) and Richard Petriccione (a Vice President of the college)."); id. at 143 (holding that a fact finder could infer that "Brennan, Petriccione, or both, played a meaningful role in the decision to terminate Holcomb."); Bickerstaff, 196 F.3d at 450. While the evidence in this regard is weak, Myers was the second highest ranking SUNY Cobleskill official after Zingale, had been in charge of the College for some time before Zingale was selected as President, and had sent e-mails and memoranda to Zingale which appear to discuss a joint decision to remove Plaintiff as Dean.

Construing this evidence in the light most favorable to Plaintiff and drawing reasonable inferences in his favor, a reasonable fact finder could conclude that Zingale consulted with Myers, and perhaps relied upon her advice, in making the decision whether to remove Plaintiff as Dean.  From this, a reasonable fact finder could conclude that Myers's impermissible bias tainted the ultimate decision made by Zingale.  Because this is a motion for summary judgment where the Court must look only to see if material disputes exist, see Gorman–Bakos v. Cornell Coop. Extension of Schenectady Cnty., 252 F.3d 545, 558 (2d Cir. 2001) ("The function of the district court in considering the motion for summary judgment is . . . only to determine whether there is a genuine issue to be tried. "), this inference is sufficient to defeat Defendants' motion on this issue.  Therefore, Defendants' motion in this regard is denied.

### d.   Plaintiff's Ultimate Burden- SUNY Delhi Provost's Position

The Court will next turn to the claim that Defendants Myers and Zingale retaliated against Plaintiff for his complaints of the race based implications of the College's policies by providing negative references in his bid for the position of Provost at SUNY Delhi.  A plaintiff can establish an actionable claim of discrimination if he can show that his employer prevented him from obtaining another position through the use of a negative employment reference and that the negative reference was issued as retaliation for engaging in protected conduct. See Bascom v. Fried, 2008 U.S. Dist. LEXIS 25466, at *12 n. 3 (E.D.N.Y. Mar. 31, 2008);[12] see also Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006);[13] Wanamaker v. Columbian Rope Co., 108 F.3d 462, 466 (2d Cir. 1997);[14] Hashimoto v. Dalton, 118 F.3d 671, 674 (9th Cir.1997).[15]  However, to establish a retaliation claim based on a negative employment reference, a plaintiff must first prove that a "*false* statement negatively affected [the plaintiff's] chances of securing employment." Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 79 (2d Cir. 2005) (emphasis in original); see id. at 178-79.[16]  Here, Plaintiff has not established that

---

[12]("There is little question that the dissemination of adverse employment references can constitute a violation of Title VII if motivated by discriminatory intent.")(interior citations and quotation marks omitted).

[13](retaliation can be any type of materially adverse action that might dissuade a reasonable workers from making or supporting a charge of discrimination).

[14]( "[P]laintiffs may be able to state a claim for retaliation ... if ... the company ... sullies the plaintiffs reputation.") (internal citations omitted)

[15]( "[D]issemination of the negative job reference is an actionable employment decision.")

[16]The Second Circuit wrote in Jute:

In order to recover on the negative job reference claim, Jute must first show that [the employer's] comment amounted to an adverse employment action. There exist "no bright-line rules" in this area, so that "courts must pore over each case to determine whether the challenged employment action reaches the level of adverse." Wanamaker v. Columbian

Defendants provided a false statement about him to SUNY Delhi President Vancko, the individual who made the final decision on the SUNY Delhi Provost's position.

Moreover, and assuming *arguendo* that Myer's "unfavorable" reference was "false," the evidence indicates that Myers and Zingale's references had no impact on Vancko's decision on the Provost's position.  Thus, Plaintiff cannot establish that anything Defendants did prevented him from obtaining the Provost's position, and, consequently, the claims related to this position fail and are dismissed.  See Abreu v. New York City Police Dept., 329 Fed. Appx. 296, 298, 2009 WL 835072, at * 1 (2d Cir. March 31, 2009).[17]

## V.    CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment [dkt. # 50] is **GRANTED in part and DENIED in part**.  The motion is granted inasmuch as the Title VI claims against Defendants Myers and Zingale with regard to the SUNY Cobleskill Dean's position are **DISMISSED,** and **all** claims with regard to the SUNY Delhi Provost's position are **DISMISSED**. The case remains viable as to the Title VI claim against SUNY Cobleskill with regard to the SUNY Cobleskill Dean's position, and the Section 1981 Claim against Defendants Myers and Zingale with regard to the SUNY Cobleskill Dean's

---

Rope Co., 108 F.3d 462, 466 (2d Cir. 1997) (internal quotation marks omitted). In the context of this case, we hold that a reasonable jury, after hearing the defendant's evidence to the contrary, could find that [the employers's] *false* statement negatively affected Jute's chances of securing employment. See *EEOC Compliance Manual* § 8-II(D)(2) (May 20, 1998)(citing as possible example of post-employment retaliation "actions that are designed to interfere with the individual's prospects for employment"); cf. Pantchenko v. C.B. Dolge Co., 581 F.2d 1052, 1054 (2d Cir. 1978) (*per curiam*). The claim is therefore actionable.

Jute, 430 F.3d 178-79.

[17]("First, [plaintiff] cannot show that he suffered an adverse employment action, as he failed to prove that any of [his Lieutenant's] statements impacted his ability to secure subsequent work.")

position.

**IT IS SO ORDERED**

**Dated:** February 10, 2012


Thomas J. McAvoy
Senior, U.S. District Judge